WARE v. FAIRBANKS-MORSE CO. OF TEXAS. (No. 8252.)

(Court of Civil Appeals of Texas. Dallas. Nov. 6, 1919. Rehearing Denied Jan. 10, 1920.)

1. CORPORATIONS ☞404(1) — GENERAL MANAGER HAS POWER TO MODIFY CONTRACT.

General manager of corporation selling lighting plant had power to modify terms of contract so that buyer would retain from price a stated amount until guaranty of a machine was made good.

2. EVIDENCE ☞445(1) — MODIFICATION OF WRITTEN CONTRACT MAY BE SHOWN.

Where a written contract has been modified by parol agreement with agent authorized to make such modification, the whole transaction as to the modification may be shown in evidence.

3. SALES ☞440(3) — EVIDENCE ADMISSIBLE THAT ENGINE DID NOT MEET GUARANTY.

Where seller of a lighting plant guaranteed that an electric engine not installed at time of sale would develop a stated power, it was competent in action for balance of price to show that defendant and its representatives tested the engine, and that it did not make the guaranteed power.

4. EVIDENCE ☞445(2) — MODIFICATION OF WRITTEN CONTRACT MAY BE BY PAROL.

Where seller of a lighting plant guaranteed that an electric engine not installed at time of sale would develop a stated power, evidence that defendant at time of test of machine agreed that a portion of the price would be held back until the guaranty was made good was competent, though contract was in writing.

5. EVIDENCE ☞519 — TEST OF GUARANTEED ENGINE BY BUYER'S EXPERT ADMISSIBLE AGAINST SELLER.

On an issue whether an electric engine would develop the power guaranteed by the seller, testimony as to its lack of power by a fully qualified expert who had shown himself capable of making a proper test of the engine was improperly excluded.

Appeal from District Court, Dallas County; E. B. Muse, Judge.

Action by the Fairbanks-Morse Company of Texas against William Ware. Judgment for plaintiff, and defendant appeals. Reversed, and cause remanded for new trial.

Wynne, Wynne & Gilmore, of Wills Point, for appellant.

Burgess, Burgess, Chrestman & Brundidge, of Dallas, for appellee.

RAINEY, C. J. Appellee, as successor in interest to Texas Machinery & Supply Company, sued appellant for $954, balance due on a written contract for certain electric engine and appliances constituting the lighting plant installed at Wills Point, Tex., and to foreclose a mortgage lien.

Appellant answered by general demurrer, general denial, and specially:

That he "admits the execution of the contract as set out and described in plaintiff's petition, and charges that he entered into it in good faith, and that he owed the amount of money, $954, as claimed by plaintiff, together with attorney's fees and interest from March 17, 1917, unless the same should be defeated by the averments in this his answer and the proof made hereunder; in other words, he admits the execution of the contract, admitted that he had not paid the $954; admitted that it was due March 17, 1917, and that it bore 10 per cent.

interest from maturity, and admitted that it provided for 10 per cent. attorney's fees if he refused to pay; but in paragraph 3 of said answer he sets up the fact that at the time he became the purchaser of the machinery set out and described in said contract he purchased it without having seen it, and bought it solely upon the representations of the appellee and its ancestor in title; that the appellee had taken over the contract and had obligated itself to carry out all the terms of the contract and with full notice of appellant's rights under the contract, and how he had become the purchaser of the property described therein, and had full notice, both actual and constructive, of appellant's right under the contract. Appellant further alleges that in one part of the contract, constituting the main ·part of the machinery that he had purchased thereunder, was one oil burner engine; that,· according to the terms of the contract, the engine was to be 75 H. P. and was to develop, after being installed, 55 KVA's (in power), and was to carry this load continuously for 24 consecutive hours; that he purchased the engine solely upon the representations of the seller; that the engine was not present at the time he purchased it, but by the terms of the contract it was to be installed in the city of Wills Point, together with the other machinery, and was to be there tested out and then to be accepted or rejected by the appellant. Appellant further alleges that' before the installation of the machinery in Wills Point appellee became the purchaser of the contract and attempted to carry it out by installing the machinery as provided for in the contract and delivering it thereby to appellant. Appellant further charges in his answer that the machinery was installed in his electric light plant at Wills Point, and was by the servants, agents, and employés of the appellee fully tested out, and the appellant was called on by the appellee, so he alleges and charges, to accept the machinery; that this test was made in February, 1916. He alleges further in his said answer that upon the test of the machinery he refused to receive it; that a fraud had been perpetrated upon him, and that the machinery was not in accordance with the representations of the appellee, and did not come up to the contract, and that he refused to receive and accept it; that a fraud had been perpetrated upon him, and that a different engine was delivered to him than the one sold to him; that the one purchased by him was guaranteed to be 75 H. P. and to develop 55 KVA's, that being the term designating power of an electric engine, and that, instead of delivering to him the 75 H. P. engine and one that would develop 55 KVA's and carry the load for 24 consecutive hours, if necessary, they delivered to him an engine of much less power; that it would not develop 34 KVA's and carry the load with any degree of certainty. He alleges in March, 1917, that at the special instance and request of the appellee he did permit a further test of the engine for power, and that the manager and secretary of the appellee was present when said test was made, and that after the test was made that he accepted all the machinery except the engine, and that the engine had failed to develop the power as called for in the contract, but that by agreement with the manager and secretary of the appellee, who had full power and authority to make the contract, it was agreed ·to by them that the appellant should retain possession of the machinery, continue to operate it and· try it out, and was to pay to appellee all of the purchase money except $954, which appellant was to hold back until March 17, 1917, without interest, as a guaranty that appellee would make the engine develop the power. Appellant further charges in said answer that this agreement was entered into, and that he did pay in good faith to appellee the full price of all the machinery, amounting to practically $5,000 in cash, reserving $954 to guarantee him against any loss that he might sustain by reason of the engine refusing or failing to develop the power. He further charges in his said answer that all of the money was paid except the $954, and that was held in his possession for the purpose above alleged;" that the engine had failed to develop the required power, of which appellee was notified, and notified to make further tests or to pay the damages, $1,250. He offered back the engine or to pay appellant full price for engine if a good one was installed.

Appellee filed supplemental petition alleging estoppel of appellant by reason of his using the machinery without notifying appellee of defects after tests had been made according to contract.

Upon a trial a verdict was instructed for plaintiff, and defendant appeals.

[1] The consideration agreed to be paid by appellant for said engine and machinery was $4,954, to be paid as follows:

"$1,000 when machinery is ready for shipment; $1,000 when erected and tested; the balance in 18 equal monthly payments beginning 60 days after shipment. Freight deducted from second payment."

Soon after the test of the machinery was made on March .17, 1916, all the consideration was paid by appellant except the sum of $954, which was held back by Ware, as pleaded by Ware under a verbal contract made between him and F. C. Dierks, manager of appellee, to indemnify him in the event appellee failed to make the engine described in the contract develop the power contracted for. Dierks being the manager of appellee corporation, he had the right to make such an agreement. It was a modification of the original contract between them, and a recovery of said amount depended upon appellee's engine making the power specified in the contract, and we think the court erred in excluding the testimony of Dierks, elicited by appellant on this phase of the case, as specified in appellant's assignments of error Nos. 2, 3, and 4.

[2] The court also erred, as complained of by the fifth assignment of error, as follows:

"The court erred in refusing to permit the defendant, William· Ware, while on the stand testifying in his own behalf, and said witness would have testified if permitted by the court, to the following facts: That he contracted for this machinery with the plaintiff or the plaintiff's ancestry in title; that he bought it solely upon the ·representations of the plaintiff; that they represented to him at the time he

entered into the contract that the engine would devlop 75 H. P. and would develop 55 KVA's, and, relying upon these representations, he executed the contract and paid the cash payment; thereafter, in January, 1916, the machinery shipped to him by the plaintiff under the contract was installed in his electric light plant in Wills Point, and the plaintiff was notified of its installation, and sent its experts down, three of them, to test out the machinery and see if it was in accordance with the contract entered into; that the defendant, with the agents of the plaintiff, tested the machinery, the defendant rendering everything they asked to complete the test with and make it a perfect test; that the general manager of the plant was present, Mr. F. C. Dierks, and that the agent of the plaintiff making the test informed Mr. Ware and Mr. Dierks, both being present, that the engine would not develop the power, and that they could not make it carry the load in accordance with the contract, and thereupon, and within ten days, this defendant served a written notice upon the plaintiff bearing date 9th day of February, 1916, by registered mail, calling plaintiff's attention to the defects, one of them was that the engine would not develop the power; that thereupon the plaintiff asked the defendant to let them make a further test, and in March, 1916, he agreed that they could test it again and see if they could make it develop the power; that the general manager for the plaintiff, Mr. Dierks, came with two other employés whom he claimed to be experts in testing out the machinery, one of them named Murray, and the other named Curtis, and also the sales agent who sold the defendant the machinery, Mr. Carsey; that they tested the machinery out again, the defendant furnishing them everything they asked for, and they failed to make it develop the power, and Mr. Murray, in the presence of Mr. Dierks and in the presence of the defendant, stated that the engine would not develop the power; that the only way they could make it pull the load would be to take a stick and break the electric lights; that he could not make it develop the power, and that he turned to Mr. Dierks and said to him, 'If you have any other better man than I am, you get him; I cannot make it do it,' and that Mrs. Ware was there and heard this statement. We expect to prove further that Mr. Dierks asked him to continue to operate the plant and they could settle the matter in this way, that this defendant would pay to the plaintiff all but $954, and that he could hold back that until they made the engine develop the power as guaranteed that they would do it, and that he did hold back the $954 for that purpose; that beginning in May, June, July, August, September, October, and November, 1916, he asked the plaintiff to test out the machine and told them it was not giving satisfaction and would not pull his load, and that they sent four different times different engineers that claimed to be skilled with testing the machinery out and it would not pull the load; that in December he called upon the plaintiff to make a further test of the machinery, and they told him if he would take off the direct current—that is, a small machine that pulled the direct current—that they thought they could make it operate; that he took it off, and in January wrote them a letter that it

was off and his money was becoming due, $954, and he wanted it tested out, and he wrote this letter, and he got a letter from the plaintiff acknowledging its receipt, the defendant stating that he had taken the direct current off and if they would just make it test out with the alternating current it was all right; that the plaintiff refused to make any test of it, and that he, the defendant, notified the plaintiff that he was going to have it tested by an expert, and did have it tested by Dr. A. C. Scott, who is an expert in this kind of machinery, and he applied the most modern test, the defendant asking the plaintiff to have an agent present at the time the test was made, and the plaintiff refused, and in testing the machinery out it only would develop 39 KVA's; that he notified the plaintiff; that the difference in the price of an engine that will develop 55 KVA's and one that will develop 40 KVA's is $1,250. The plaintiff, through its attorney, Mr. Chrestman, objected to the testimony of the witness, because the contract, with its modification, is in writing and shows estoppel. We submit that this was error of the court, and motion for new trial should be granted; this clearly appearing in bill of exceptions No. 4."

We find no statement in the record showing that the modification of the contract was in writing.

[3] The sixth assignment of error complains of the court in refusing to permit the witness Otis Knowles to testify as follows:

"That he was running an engine for ten years, and he is well acquainted with the operation of an engine such as is in controversy in this case; that he was operating the electric plant for the defendant at Wills Point, and aided and assisted him in installing the machinery bought from the plaintiff, including the engine bought from the plaintiff; that after it was installed a man by the name of Murray and Curtis and Olsen came down for the plaintiff to test out the machinery, February 5, 1916; that the defendant furnished them everything they asked for to make the test, and he was present while the engine was being tested for power; that the engine would not develop and hold the load over about 33 KVA's in the test made by them; that he was present, and as soon as they concluded their test they demanded of this defendant to sign an unconditional acceptance of the machinery. The defendant declined to do so for the reason that the engine would not develop the power and was not the engine that he had contracted for and bought, and asked them to put him in an engine that would develop the power and the money was ready; that subsequent to this, in March, 1916, a representative of the plaintiff, Mr. Dierks, came back with Mr. Murray and two other experts of theirs, and said they wanted to again test out the engine and see if they could make it develop the power; that the defendant supplied them with everything they asked for to make the test with, and that they made the test for three or four days, and were never able to make it develop more than 40 KVA's. and would not hold that but for three or four minutes; that after they got through with the test—that while they were making the test he heard Mr. Murray, who was the expert making the test for the plaintiff,

tell Mr. Dierks in the presence of the defendant that the engine would not pull the load and would not develop the power and he had done all he could do with it, and that there was but one way to make it do it, and that was to take a stick and break the lights; that the engine would not pull the load; that he could not make it do it.

"The Court: Now do you object to that?

"Mr. Chrestman: Yes.

"(The court approves that bill with the qualifications of the record gone before.)

"Mr. Chrestman: My objection is based on the same ground I have stated so many times.

"The Court: All right.

"(For this error the court should grant a new trial; the matter clearly appearing in defendant's bill of exceptions No. 5.)"

The appellant having·purchased the engine upon the representations of appellee, he had no means of determining its power until placed in his plant at Wills Point, and the testimony rejected was pertinent on that issue, and the court erred in rejecting it.

[4] The seventh error assigned complains of the court's rejection of Mrs. Ware's testimony, as follows:

"That she was present, at the time Mr. Dierks, Mr. Murray, and Mr. Carsey were there, and that she heard Mr. Murray tell Mr. Dierks and Mr. Ware that the engine would not develop the power and would not develop over 35 KVA's and would not hold it, and said that the engine was all right up to the power it would develop, but it would not pull the load, and the only way he could make it pull would be to take a stick and break the electric lights and destroy the direct current machine, and that there was a controversy between Mr. Dierks and his own man, and Mr. Dierks agreed that the engine would not pull the load, but told Mr. Ware that he could pay all but enough to make good the engine, and they agreed on $954 for Mr. Ware to hold back until they did make the power of the engine good, and that Mr. Ware agreed to this, and that the plaintiff agreed through Mr. Dierks to further test out the engine, and if he made the engine pull 55 KVA's, Mr. Ware was to pay the balance of the $954, and had a year in which to do this, and that, if he failed to make it good, this $954 was to indemnify Mr. Ware for the difference in the value of the two engines."

Appellant contends that—

"It is a well-settled proposition of law in this state that, where plaintiff declares upon a written contract for sale and delivery of machinery, and sues for the purchase price, and the defendant admits the execution of the contract, but charges that the machinery was not present, but that he relied solely upon the representations of the plaintiff as to the kind of machinery he was to receive, and plaintiff perpetrated fraud upon him by delivering a different kind of machinery from that in contract, and thereby perpetrating a fraud upon him, and machinery delivered was of much less value than machinery contracted for, he is entitled to prove his defense, and is not estopped by the written contract, as he does not declare upon the written contract, but relies upon the fraud as his defense."

While it is questionable whether or not the principle of legal fraud strictly applies in this case, we think, if the agreement was made in regard to the retention of the $954 with Dierks, as pleaded by appellant, it was a good plea, and, if proven before a jury, it would defeat a recovery by appellee, as the warranty was that the engine should develop a given power. It is true Dierks testified that he made no such agreement, but that was not a sufficient excuse to reject this testimony, but said testimony should have been admitted for the jury's determination as to its probative force.

[5] We are also of the opinion that the court erred in not permitting Dr. Arthur Scott to testify as to the power of the engine. He fully qualified as an expert and showed himself capable of making a proper test.

The trial court accepted appellee's testimony that appellant had not complied with the terms of the contract in failing to notify it of the objections to the machinery by registered letter within the specified time and as to appellant using it thereafter. Appellant pleaded a compliance with said terms of the contract, and some of the testimony rejected, as we have quoted, if admitted, was sufficient to have raised an issue, and it should have been left to the jury for its determination.

The case has not been fully tried, and for the errors stated the judgment is reversed, and the cause remanded for a new trial.